UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- versus -

STATEMENT OF REASONS
FOR (1) ACCEPTING THE
DEFERRED PROSECUTION
AGREEMENT AND (2) MY
POLICY DISAGREEMENT
WITH THE GUIDELINES'
FAILURE TO ENCOURAGE
DIVERSION PROGRAMS

SINEM DOKMECI,

13-CR-00455 (JG)

Defendant.

UNITED STATES OF AMERICA,

- versus -

STATEMENT OF REASONS
FOR (1) IMPOSING A NON-
INCARCERATORY SENTENCE
AND (2) MY POLICY
DISAGREEMENT WITH THE
GUIDELINES' FAILURE TO
ENCOURAGE ALTERNATIVES
TO INCARCERATION

CHLOE JAKAB,

13-CR-00565 (JG)

Defendant.

JOHN GLEESON, United States District Judge:

## INTRODUCTION

As a nation, we need to deal with—and not just talk about—our over-incarceration problem. We need to make smart, bold choices about two things: (1) the lengths of the prison terms we impose on those who need to be imprisoned; and (2) the categories of defendants we routinely incarcerate who don't need to be imprisoned in the first place.

On the first issue, Justice Anthony M. Kennedy told the American Bar Association ("ABA") more than a dozen years ago that the federal mandatory minimum sentences for drug trafficking defendants are "unwise and unjust," that they should be repealed, and that the United States Sentencing Guidelines ("Sentencing Guidelines" or "Guidelines") ranges linked to those mandatory minimums "should be revised downward."[1] A chorus of other voices has asked Congress to roll back or repeal those mandatory minimums[2] and asked the United States Sentencing Commission ("Commission") to delink the drug offense Guidelines ranges.[3] Those voices fell on deaf ears, and the result is the over-incarceration crisis in the

---

[1]     Anthony M. Kennedy, Associate Justice, Supreme Court of the United States, Address at the ABA Annual Meeting (Aug. 9, 2003), at 4-5, *available at* http://www.supremecourt.gov/publicinfo/speeches/sp_08-09-03.html ("Justice Kennedy Speech").

[2]     *See, e.g.*, *Agency Perspectives: Hearing Before the Over-Criminalization Task Force of the H. Comm. on the Judiciary*, 113th Cong. (2014) (statement of Patti B. Saris, Chief Judge, Chair, United States Sentencing Comm'n) ("The Commission has found that existing federal mandatory minimum penalties apply too broadly and create problematic disparities."); ABA Justice Kennedy Commission, Reports with Recommendations to the ABA House of Delegates 26 (2004) ("[M]andatory minimum sentences . . . should be avoided, so that sentencing courts may consider the unique characteristics of offenses and offenders that may warrant an increase or decrease in a sentence."); *Why Should I Care?*, Families Against Mandatory Minimums, *available at* http://famm.org/sentencing-101/the-facts/ (mandatory minimums do not necessarily reduce crime, but are instead expensive and tear families apart).

[3]     *See generally United States v. Diaz*, 2013 WL 322243, at *3 (E.D.N.Y. Jan. 28, 2013); *see also, e.g.*, Molly Treadway Johnson & Scott A. Gilbert, Federal Judicial Center, *The U.S. Sentencing Guidelines: Results of the Federal Judicial Center's 1996 Survey* 12 (1997) (79% of sentencing judges agree that the Guidelines should be delinked from statutory mandatory minimums); Letter from the Committee on Criminal Law of the Judicial Conference of the United States to the U.S. Sentencing Comm'n (Mar. 16, 2007) (seeking delinkage).

federal criminal justice system today.[4]

The tide is just beginning to turn on this issue, and as a result the number of prisoners in federal institutions dropped in 2014 for the first time in 34 years.[5]  The Bureau of Prisons ("BOP") called the decline "a welcome change," surely an understatement given the fact that the inmate population increased by almost 750% between 1980 and 2014, leading to medium and high security prisons operating at 39% and 52% over capacity, respectively.[6]  The downward trend has continued; as of March 3, 2016, there were 195,728 people in federal custody.[7]  Changing policies have sparked this trend, including (1) the Fair Sentencing Act of 2010, which finally reduced (but inexplicably failed to eliminate) the shameful, racially discriminatory disparity between punishments for offenses involving crack cocaine and powder cocaine;[8] (2) an August 2013 Department of Justice ("DOJ") policy that restricts the use of drug

---

[4]     The effects of the ultra-harsh mandatory minimums are well known in the federal criminal justice system.  But the Commission's unexplained linkage of the Guidelines ranges to those mandatory minimums had an even more pernicious effect.  In its own report 15 years into the Guidelines era, the Commission acknowledged the dramatic effect of that fateful decision:

> This is unfortunate for historians, because no other decision of the Commission has had such a profound impact on the federal prison population.  The drug trafficking guideline . . . had the effect of increasing prison terms far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes.

U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform iv (2004).

[5]     *See Federal Inmate Population Declines*, Fed. Bureau of Prisons (Sept. 30, 2014), *available at* http://www.bop.gov/resources/news/20141024_populationDecline.jsp.  In 2013, there were around 219,000 people incarcerated; in 2014, that number dropped to around 214,000.  *Id.*

[6]     *Id.*  As I wrote in *United States v. Leitch*, 2013 WL 753445, at *1 (E.D.N.Y. Feb. 28, 2013), the "federal prison population . . . exploded during the determinate sentencing regime ushered in by the Sentencing Reform Act of 1984," and the accompanying "increased severity of federal drug trafficking sentences."  *Id.* (citations omitted).

[7]     *See Total Federal Inmates*, Fed. Bureau of Prisons (Mar. 3, 2016), *available at* https://www.bop.gov/about/statistics/population_statistics.jsp.

[8]     *See* Fair Sentencing Act of 2010, Pub. L. No. 111-220 § 2(a), 124 Stat. 2372 (increasing the triggering amount of crack for a 5-year mandatory minimum sentence from 5 to 28 grams, and for a 10-year

offense mandatory minimums;[9] (3) a September 2014 DOJ policy that prohibits the use of

recidivism-based enhancements of those mandatory minimums to coerce guilty pleas and punish

defendants who go to trial;[10] and (4) the so-called "Drugs Minus Two" amendment passed in

2014, by which the United States Sentencing Commission (the "Commission") lowered most

drug offense Guidelines ranges by two levels.[11]  These changes have begun the process of

mandatory minimum sentence from 50 to 280 grams, thus reducing the infamous 100-to-1 ratio for quantities that trigger the mandatory minimums to an 18-to-1 ratio).  Prosecutors themselves asked for a reduction to a 1-to-1 ratio. *See Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 111th Cong. 100 (2009) (statement of Lanny A. Breuer, Assistant Att'y Gen., Criminal Div., U.S. Dep't of Justice), *available at* https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/2009/04/29/2009-04-29-crm-breuer-crack-powder.pdf ("The Administration believes Congress's goal should be to completely eliminate the sentencing disparity between crack cocaine and powder cocaine.").  When prosecutors ask for harsher penalties (or Federal Defenders ask for lighter ones), there is reason for skepticism.  But on the rare occasions when prosecutors ask for a *reduction* in sentences, you can take that to the bank.  Nonetheless, the other institutions involved in sentencing policy—Congress and the Commission—were not up to the task, so they maintained a meaningful degree of unjustness and racial discrimination in our regime for punishing crack cocaine offenses.

[9]        Memorandum from Att'y Gen. Eric Holder to the United States Attorneys and Assistant Att'y Gen. for the Criminal Div. (Aug. 12, 2013), *available at* https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/ag-memo-department-policyon-charging-mandatory-minimum-sentences-recidivist-enhancements-in-certain-drugcases.pdf.  Where it is followed, the August 2013 policy goes a long way toward narrowing the category of defendants who are subjected to the harsh mandatory minimums to the small percentage of drug defendants for whom Congress intended them, that is, the 7% who are either leaders or managers of drug trafficking organizations. *See United States v. Dossie*, 851 F. Supp. 2d 478, 479-81 (E.D.N.Y. 2012) (discussing the origin and intent of the mandatory minimums); *see also United States v. Kupa*, 976 F. Supp. 2d 417 (E.D.N.Y. 2013) at 453-59 (discussing the effect of the August 2013 policy).

[10]        *See* Memorandum from Att'y Gen. Eric Holder to the Dep't of Justice Attorneys (Sept. 24, 2014), *available at* https://www.fd.org/docs/select-topics/sentencing-resources/memorandum-to-all-federal-prosecutors-from-eric-h-holder-jr-attorney-general-on-851-enhancements-in-plea-negotiations.pdf?sfvrsn=6; *see also Kupa*, 976 F. Supp. 2d at 431–41 (discussing these now-prohibited uses of 851 enhancements).

[11]        *See* Amendment 782 to 18 U.S.C. § 3582(c)(2) (July 18, 2014).  The reduction was embarrassingly minor.  All it did is lower the Guidelines ranges so they straddle the onerous 10-year and 5-year mandatory minimums to which they are linked, rather than slightly exceed them, as they did before.  The Commission was at pains to announce that it would *not* be leading the way toward real reform.  "Our proposed approach is modest," the Chair admitted in a press release, "[t]he real solution rests *with Congress*[.]"  News Release, U.S. Sentencing Comm'n, *U.S. Sentencing Commission Seeks Comment on Potential Reduction to Drug Trafficking Sentences* (Jan. 9, 2014), *available at* http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20140109_Press_Release.pdf (emphasis added).

        With respect, that is simply wrong.  Only Congress can repeal or amend a mandatory minimum, but the "real" solution to overly harsh *Guidelines ranges* should come from the Commission—the expert body that was created to make and revise them—which would require a degree of boldness and leadership:

reducing the lengths of federal prison terms.

        My main focus here is on the second contributor to over-incarceration: we sentence too many people to prison in the first place. In the same 2003 address in which he decried the harshness of mandatory minimums and the Guidelines ranges that are linked to them, Justice Kennedy also spoke about the vital importance of "bridg[ing] the gap between proper skepticism about rehabilitation on the one hand and improper refusal to acknowledge that the more than two million inmates in the United States are human beings whose minds and spirits we

---

The Commission's guidelines must 'reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process.' The Commission cannot ignore its statutory mandate to create a just sentencing regime based on knowledge and expertise and simply accept Congress's view about the sentence for one particular offense as the appropriate baseline for every other similar offense.

Congress did not consult the Commission in setting its mandatory minimums, and it did not base them on 'advancement in knowledge of human behavior.' While mandatory minimums are binding, Congress has never explicitly stated that these minimums were meant to replace the Commission's expertise in setting all other guidelines sentences for which there are no mandatory minimums. Congress's failure to provide a simple directive indicating otherwise suggests that it left the question of appropriate sentences for offenses without mandatory minimums to the Commission's judgment.

Rachel E. Barkow, *Sentencing Guidelines at the Crossroads of Politics and Expertise*, 160 U. Pa. L. Rev. 1599, 1616 (2012) (footnotes omitted), *available at* https://www.law.upenn.edu/journals/lawreview/articles/volume160/issue6/Barkow160U.Pa.L.Rev.1599(2012).pdf; *see also id.* at 1602 ("An entire system of guidelines should not be determined by legislative judgments that are contrary to sentencing expertise unless the legislative body makes it clear that it desires this outcome.").

        A Commission that believes that "[r]educing the federal prison population has become urgent," and supported legislation that would have required it to slash *all* drug offense Guidelines ranges by at least by half, has no justification for not lowering those ranges itself. News Release, U.S. Sentencing Comm'n, *U.S. Sentencing Commission Votes to Reduce Drug Trafficking Sentences* (Apr. 10, 2014), *available at* http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20140410_Press_Release.pdf; *see also* News Advisory, U.S. Sentencing Comm'n, *Comment of Judge Patti B. Saris, Chair, United States Sentencing Commission on the Senate Judiciary Committee's Bipartisan Vote to Report the Smart Sentencing Act* (Jan. 30, 2014), *available at* http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/news-advisories/20140130_News_Advisory.pdf (lauding the Senate Judiciary Committee's bipartisan vote to report the Smarter Sentencing Act).

must try to reach."[12]  A grassroots movement in the federal courts is bridging that gap.  This movement, the alternative to incarceration[13] movement, targets categories of defendants in the federal courts who have routinely but unnecessarily been sentenced to prison terms over the past 25 years, and seeks to deal with those defendants in better, more humane, and more cost-effective ways.

I wrote about this movement three years ago, when it was in its infancy, in *United States v. Leitch*, 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013) ("*Leitch*").  I set forth there why alternatives to incarceration are such a critical part of the answer to our over-incarceration crisis.  Drug courts, for example, reduce the steep costs of incarceration, and they also do a better job than traditional supervision of treating their participants' dependence on drugs.  As I said in *Leitch*, "[w]e can do a lot, right now, to significantly reduce the unnecessary and excessively punitive costs of over-incarceration."[14]  That remains true today.  Presentence federal drug and other problem-solving courts, designed to afford participants the opportunity to avoid prison, are proliferating around the country.  In 2013, when I wrote *Leitch*, there were seven such programs

---

[12]  Justice Kennedy Speech at 4.

[13]  References to "alternative to incarceration" programs in this statement of reasons are to presentence programs designed to result in sentences not involving incarceration.  A "diversion program" is designed to do that but also to result in no sentence at all, as the charges are dismissed upon successful completion. Both are distinct from reentry programs that follow the execution of a prison term, and which are designed to allow a participant early termination of a supervised release term.  The cost savings from reentry programs stem from a shortened period of supervision and a possible reduction in recidivism rates.  As discussed further below, the cost savings from alternative to incarceration and diversion programs are much greater because they avoid the high cost of imprisonment.

[14]  *Leitch* at *2.

within the 94 federal judicial districts.[15]  Today, there are 22.[16]

This past fall, Chloe Jakab and Sinem Dokmeci successfully completed the Pretrial Opportunity Program ("POP"), the presentence drug court in this district.[17]  POP is not a re-entry drug court; it is a *no-entry* drug court.  According to the Commission's Guidelines Manual, Jakab should have received a term of imprisonment of 41–51 months,[18] at a total cost of $117,376.[19]  She would have been ineligible for a non-incarceratory sentence.[20]  But because of her successful participation in the POP program, I sentenced Jakab to time served (two months of

---

[15]     These programs were the Central District of California's Conviction and Sentence Alternatives ("CASA") Program; the District of Connecticut's Support Court; the Central District of Illinois' Pretrial Alternatives to Detention Initiative ("PADI"); the District of South Carolina's BRIDGE program; the Western District of Washington's drug court; and, of course, the POP and SOS programs in this district.  Descriptions of these programs are set forth in *Leitch*.  *See id.* at *3 n.25.

[16]     A full list of the federal alternatives to incarceration programs is set forth in Table 3, *infra* pp. 17.

[17]     *See generally* Second Report to the Board of Judges on Alternatives to Incarceration 2015, United States District Court for the Eastern District of New York (Aug. 17, 2015), *available at* https://www.nyed.uscourts.gov/news/second-report-board-judges-alternatives-incarceration-2015 ("E.D.N.Y. Report").

[18]     Jakab was charged with one count of conspiracy to distribute and possess with intent to distribute oxycodone, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(C).  Indictment, ECF No. 7 (Oct. 2, 2013).  Her Guidelines calculation was as follows: base offense level 24 (U.S.S.G. § 2D1.1(a)(5)), reduced by a three-level acceptance of responsibility adjustment (*id.* § 3E1.1(a)).  *See* Presentence Investigation Report at 10; Addendum to the Presentence Investigation Report at 2.  With a total offense level of 21 in Criminal History Category of II (due to three old shoplifting convictions, *see* Presentence Investigation Report at 10–11), Jakab's Guidelines range was 41-51 months, or a midpoint of 46 months.  U.S.S.G., Ch. 5, Pt. A.  The narrow exception for post-sentence drug treatment, described below, is limited to defendants in Zone C.

[19]     The average annual cost of housing a federal prisoner in 2014 was $30,619.85.  *Annual Determination of Average Cost of Incarceration*, Fed. Bureau of Prisons (March 9, 2015), *available at* https://www.federalregister.gov/articles/2015/03/09/2015-05437/annual-determination-of-average-cost-of-incarceration ("Fed. Bureau of Prisons Annual Cost of Incarceration").  Thus, at roughly $2,552 per month, the cost of Jakab's incarceration was $117,392 ($2,552 multiplied by 46).

[20]     *See* U.S.S.G. § 5B1.1 cmt. n.2 ("Where the applicable guideline range is in Zone C or D of the Sentencing Table (*i.e.*, the minimum term of imprisonment specified in the applicable guideline range is ten months or more), the guidelines do not authorize a sentence of probation.").  Jakab's Guidelines range, at 41-51 months, was in Zone D of the Sentencing Table.  *Id.* at Ch. 5, Pt. A.

incarceration) and 36 months of supervised release, for a total cost of $5,104.[21]

If Dokmeci's sentence had been determined by the Guidelines Manual, she would have gotten a term of imprisonment somewhere between 37 and 46 months,[22] at a cost of $104,632.[23] Instead, the government informed me that in light of her astounding success in POP, I need not sentence Dokmeci at all. Rather, the government entered into a deferred prosecution agreement ("DPA") with her, in which it agreed to drop all of the charges against her at the end of a period of supervision.[24] Thus, for Dokmeci, POP has become not merely an alternative to incarceration program but a diversion program as well. She will not only not have to serve time in prison for her drug trafficking offense; she won't even have a criminal conviction.

Both Jakab and Dokmeci had serious substance abuse problems that led directly to the conduct for which they were charged. In Dokmeci's case, I approved the DPA because it was—and remains—plainly in the interest of justice to do so.[25] In Jakab's, I concluded that the only just sentence was time served, which represented a substantial variance from the otherwise-

---

[21]    Minute Entry (Sept. 4, 2015). I calculated the $5,104 total cost by multiplying $2,552 by the two months that Jakab spent in prison after her arrest. *See* Fed. Bureau of Prisons Annual Cost of Incarceration, *supra* n. 19.

[22]    Dokmeci was charged with conspiracy to distribute oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C), and with acquiring oxycodone by fraud, in violation of §§ 843(a)(3) & (d)(1). Indictment, ECF No. 11 (July 31, 2013). Agents found four prescriptions made out in her name, totaling 720 30 mg oxycodone tablets. Compl., ECF No. 1, at ¶ 6. Accordingly, Dokmeci's Guidelines calculation is as follows: base offense level 24 (U.S.S.G. § 2D1.1(a)(5)), reduced by three levels for acceptance of responsibility (*id.* § 3E1.1(a)). With a Criminal History Category of I, Dokmeci's Guidelines range was 37–46 months, or a midpoint of 41 months. *Id.* at Ch. 5, Pt. A.

[23]    I calculated this figure by multiplying the midpoint of Dokmeci's prison sentence by $2,552. *See* Fed. Bureau of Prisons Annual Cost of Incarceration, *supra* n. 19.

[24]    *See* Minute Entry (Dec. 11, 2015).

[25]    I have an independent responsibility to determine whether to approve or disapprove a DPA. *See United States v. HSBC Bank USA, N.A.*, 2013 WL 3306161 (E.D.N.Y. July 1, 2013) (invoking the court's supervisory power to approve a DPA); *United States v. Saena Tech Corp.*, 2015 WL 6406266 (D. D.C. Oct. 21, 2015) (same); *United States v. Fokker Servs. B.V.*, 79 F. Supp. 3d 160 (D. D.C. 2015) (invoking supervisory power to disapprove a DPA).

applicable Guidelines range. In both cases, I found myself in complete agreement with the government but in fundamental disagreement with the relevant policy determinations of the Sentencing Commission.[26]

Congress established the Commission in 1984 to set sentencing policies and practices that, along with other goals, would (1) "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process,"[27] and (2) minimize the likelihood that the federal prison population would exceed the capacity of the federal prisons.[28] One of the ways in which the Commission has failed to achieve these goals is by refusing to authorize a downward departure for successful participation in judge-involved intensive supervised programs like POP. Although the outcomes in Jakab's and Dokmeci's cases are fully supported by the sentencing judge, the Department of Justice, and defense counsel, they are at odds (to put it mildly) with the relevant policy judgments of the Commission. By refusing to acknowledge, let alone support, presentence alternative to incarceration programs—and by doing so in the face of repeated requests over decades, a mountain of favorable social science, and a substantial grassroots movement in the federal courts—the Commission has abdicated its responsibility. Instead, it should:

-   amend the Guidelines to establish a downward departure for successful
    participation in a judge-involved intensive supervision program;

---

[26]    "Sentencing judges may impose sentences that vary from the applicable Guidelines ranges based on their disagreement with a particular policy reflected in the Guidelines." *Diaz*, 2013 WL 322243, at *3 (citing, e.g., *Spears v. United States,* 555 U.S. 261, 263–67 (2009); *United States v. Kimbrough,* 552 U.S. 85, 109–10 (2007); *United States v. Dorvee,* 616 F.3d 174, 188 (2d Cir.2010)).

[27]    28 U.S.C. § 991(b)(1)(C).

[28]    28 U.S.C. § 994(g) ("The Commission, in promulgating guidelines pursuant to subsection (a)(1) to meet the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code, shall take into account the nature and capacity of the penal, correctional, and other facilities and services available, and shall make recommendations concerning any change or expansion in the nature or capacity of such facilities and services that might become necessary as a result of the guidelines promulgated pursuant to the provisions of this chapter. The sentencing guidelines prescribed under this chapter shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission.").

-   assist federal judges by devoting a page on its website to informing them about the many existing programs; and

-   help us collect and analyze data about alternative to incarceration programs around the country.

The Commission should stand behind alternative to incarceration programs because they work. They help people get and stay clean, and they reduce our country's dependence on costly and ineffective prison terms. The support I seek is consistent with positions of DOJ, the federal judiciary as a whole, the ABA, and countless other organizations about the kinds of punishment—and treatment—people like Jakab and Dokmeci deserve.

## DISCUSSION

*A. An Overview of Alternative to Incarceration Programs*

*1. The POP and SOS Programs*

This district has two alternative to incarceration programs: POP, the program of which Jakab and Dokmeci are graduates, and the Special Options Services ("SOS") Program, which involves judges in the intensive presentence supervision of youthful offenders.[29] The idea behind these programs is simple: when people are arrested for crimes stemming from their addiction to drugs or alcohol, or from an utter lack of supervision as adolescents, we should try helping them instead of reflexively sending them to prison. POP and SOS are intensive, presentence supervision programs, where judges meet monthly with participants and their supervising officers, and where pretrial services officers and treatment providers are actively involved in the participants' lives. To successfully complete the POP program, each participant

---

[29]     POP was established in January 2012. SOS was established in January 2000, but did not begin operating with formal judicial involvement until January 2013, when two judges began regularly meeting with participants in the program. Details about the programs, as well as information about their inception, are set forth in *Leitch* and the E.D.N.Y. Report. *See Leitch* at *6–7, 9; *see generally* E.D.N.Y. Report.

must remain drug-free for twelve consecutive months, obtain a high school equivalency certificate if they do not already have one, seek and retain employment, and comply with the conditions of the drug treatment programs they are required to attend. SOS participants have the same educational and vocational requirements, and in addition they receive further intensive supervision designed for its youthful (between 18 and 25 years of age) participants.

When a participant successfully completes POP or SOS, "they can avoid (or at least shorten) a prison term, and perhaps avoid a conviction altogether."[30] The benefits to society are just as significant. The federal system is groaning under the costs of imprisoning almost 200,000 men and women. In 2014, the average annual cost to confine an inmate was $30,619.85 per year.[31] The human costs to the defendants' families and communities are incalculable. POP and SOS have already proved that for a meaningful percentage of the caseload, these costs are unnecessary.

One of the inspirations for our alternative to incarceration programs was "sentencing reforms in the states, which have turned to drug courts to help cope with the rising tide of drug offenders in their criminal justice systems over the last few decades."[32] DOJ has long been supportive of state drug courts. And data from those programs prove they work. There are more than 2,700 drug courts in the states that serve over 136,000 people.[33]

---

[30]    *Leitch* at *7. The POP and SOS programs explicitly contemplate that a participant's rehabilitation may prompt the government to seek outright dismissal of the participant's charges. E.D.N.Y. Report at 10.

[31]    Fed. Bureau of Prisons Annual Cost of Incarceration, *supra* n. 19.

[32]    *Leitch* at *6 (citing Rossman et al., Urban Institute, *The Multi-Site Adult Drug Court Evaluation: Executive Summary* 1 (2011) ("Drug courts emerged spontaneously during the late 1980s and early 1990s in response to burgeoning drug offender arrests and prosecutions that overwhelmed the capacity of numerous courts to expeditiously process such cases."); Vera Institute of Justice, *Do Drug Courts Save Jail and Prison Beds?* 1 (2000) (observing that drug courts in the states were "[d]eveloped to cope with the wave of drug offenders that began flooding the system twenty years ago")).

[33]    *Types of Drug Courts*, Nat'l Association of Drug Court Professionals, *available at* http://www.nadcp.org/learn/what-are-drug-courts/models.

Nationwide, 75% of drug court graduates do not get rearrested for at least two years after completing their program.[34]  Drug courts reduce crime as much as 45% more than other sentencing options for those eligible for the programs.[35]  A Department of Justice study shows that "drug court participants reported 25 percent less criminal activity and had 16 percent fewer arrests than comparable offenders not enrolled in drug courts."[36]  Moreover, 26% fewer drug court participants report drug use, and they are 37% less likely to test positive for illicit substances.[37]  Drug courts in the states also save money—as much as $3,000 to $13,000 per participant.[38]  Perhaps most importantly, the judge-involved treatment programs work to combat addiction.  When not accompanied by judge supervision, approximately 70% of substance-abusing offenders drop out of treatment early.[39]  Drug courts have been shown to be six times

---

[34]     *Drug Courts Work*, Nat'l Association of Drug Court Professionals, *available at* http://www.nadcp.org/learn/facts-and-figures; *see also* Vera, *Do Drug Courts Save Jail and Prison Beds?*, *supra* n. 32, at 6 ("[T]he body of literature on recidivism is now strong enough . . . to conclude that completing a drug court program reduces the likelihood of future arrest—at least within the first two years.").

[35]     West Huddleston & Douglas B. Marlowe, Nat'l Drug Court Inst., *Painting the Current Picture: A National Report on Drug Courts and Other Problem-Solving Court Programs in the United States* 9 (2011) ("Adult Drug Courts significantly reduce crime, typically measured by fewer arrests for new offenses and technical violations . . . .  The best Drug Courts reduced crime by as much as 45 percent over other dispositions.").

[36]     *Alternatives to Incarceration: A Smart Approach to Breaking the Cycle of Drug Use and Crime*, Office of Nat'l Drug Control Policy, Exec. Office of the President, at 5 (Aug. 2011), *available at* https://www.whitehouse.gov/sites/default/files/ondcp/Fact_Sheets/alternatives_to_incarceration_policy_brief_8-12-11.pdf (citing *NIJ's Multisite Adult Drug Court Evaluation*, Nat'l Institute of Justice, U.S. Dep't of Justice (2011), available at http://www.nij.gov/nij/topics/courts/drug-courts/madce.htm).

[37]     *Id.*

[38]     Huddleston & Marlowe, *supra* n. 35, at 10 ("Drug Courts have proven to be highly cost-effective . . . .  These savings reflected direct and measurable cost-offsets to the criminal justice system resulting from reduced re-arrests, law enforcement contacts, court hearings and the use of jail or prison beds.  When indirect cost off-sets were also taken into account, such as savings from reduced foster care placement and healthcare service utilization, studies have reported economic benefits ranging from approximately $2 to $27 for every $1 invested.  The result has been net economic benefits ranging from approximately $3,000 to $13,000 per Drug Court participant." (internal citations omitted)).

[39]     *Drug Courts Work*, Nat'l Association of Drug Court Professionals, *available at* http://www.nadcp.org/learn/facts-and-figures.  As I wrote in *Leitch*, "[d]rug courts have demonstrated that judicial involvement in the rehabilitative process can greatly influence a defendant's success in treatment."  *Id.* at *7 (citing Rossman et al., *supra* note 32, at 7 ("The primary mechanisms by which drug courts reduce substance use and crime

more likely to keep offenders in treatment for longer, which matters immensely in the recovery process.[40]

Our POP and SOS programs have been successful.  As shown in Table 1, 39 defendants (out of a total of 74) have now completed their participation.  Of those, 28 (71.8%) were successful.  All but two of the 28 successful participants (92.9%) received sentences that did not include incarceration.  Those results alone compel the conclusion that the programs have achieved their initial goal, that is, they are providing sensible alternatives to the incarceration reflex that has afflicted our federal system for too long.

Even better, thanks to the wisdom and leadership of United States Attorney (now Attorney General) Loretta Lynch, for fully 35.7% of the successful participants, POP and SOS have become diversion programs; these participants avoided a criminal conviction as well as a prison term."  I wrote about the first graduate of a federal presentence program to have her felony charges dismissed entirely in *Leitch*; since that time, seven more graduates have joined her in this district alone.  The POP and SOS programs thus now serve a dual role: they provide alternatives to incarceration for virtually all of their successful participants, and they are also diversion programs for many of them.

---

is through the judge."); *id.* at 8 ("Practices that appear most related to reductions in crime and substance use are judicial status hearings, judicial praise, drug testing, substance abuse treatment, and greater leverage.")).

[40] *Id.*

| Table 1[41] | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Successful and Unsuccessful Program Terminations** | | | | | | | |
| | **SOS** Brooklyn | | **POP** Brooklyn | | **POP/SOS** Central Islip | | **Totals** | |
| | N | % | N | % | N | % | N | % |
| **Number of Program Participants** | 43 | 58.1% | 19 | 25.7% | 12 | 16.2% | 74 | 100% |
| | | | | | | | | |
| **Total Number of Departures** | 16 | 41% | 15 | 38.5% | 8 | 20.5% | 39 | 52.7% |
| | | | | | | | | |
| **Successful Termination** | 10 | 35.7% | 12 | 42.9% | 6 | 21.4% | 28 | 71.8% |
| Deferred Prosecution / Dismissed | 5 | 50% | 5 | 41.6% | - | - | 10 | 35.7% |
| Term of Non-Incarceration | 3 | 30% | 7 | 58.4% | 6 | 100% | 16 | 57.2% |
| Term of Incarceration | 2 | 20% | - | - | - | - | 2 | 7.1% |
| | | | | | | | | |
| **Unsuccessful Termination** | 6 | 54.5% | 3 | 27.3% | 2 | 18.2% | 11 | 28.2% |
| Re-Arrest(s) | 1 | 16.6% | 1 | 33.3% | 2 | 100% | 4 | 36.4% |
| Technical Violations | 5 | 83.4% | 2 | 66.7% | - | - | 7 | 63.6% |
| Other | - | - | - | - | - | - | - | - |

POP and SOS are not only effective crime control measures, they are also huge money-savers. Table 2 sets forth the estimated financial savings they have produced, calculated by subtracting the prison cost of any time served by a participant who successfully completed the programs from the estimated cost of imprisonment of the recommended sentence.[42] The total savings so far are over $3 million.[43]

---

[41] The tables in this opinion were created based on data on file with the court.

[42] Specifically, I calculated each figure by multiplying by $2,552 the number of months each participant would have spent in prison based on the midpoint of each person's Sentencing Guidelines range. *See* Fed. Bureau of Prisons Annual Cost of Incarceration, *supra* n. 19.

[43] These estimates of financial savings focus solely on the cost of imprisonment that a defendant was likely to face at sentencing. It does not, therefore, incorporate the costs and/or benefits related to recidivism, administration of justice, public health, social welfare, loss of employment, and productivity.

| Participant | Disposition | | | | Midpoint of the Sentence Guideline Range | Imprisonment Cost if Recommended Sentence Imposed | Actual Prison Cost | Cost Savings |
|---|---|---|---|---|---|---|---|---|
| | Prison (# Months) | TSR (# Months) | Probation (# Months) | Pretrial Diversion | | | | |
| **Table 2** **Case Disposition and Cost Savings of Participants Who Successfully Completed the POP and SOS Programs** | | | | | | | | |
| **SOS Cases** | | | | | | | | |
| R.D. | - | - | 60 | - | 27 | $68,904 | $0 | $68,904 |
| A.P. | - | - | 36 | - | 27 | $68,904 | $0 | $68,904 |
| R.V. | - | - | 48 | - | 78 | $199,056 | $0 | $199,056 |
| E.C-P | - | - | - | Yes | 57 | $145,464 | $0 | $145,464 |
| J.C. | 12 | 36 | - | - | 27 | $68,904 | $30,624 | $38,280 |
| L.C. | - | - | - | Yes | 52 | $132,704 | $0 | $132,704 |
| R.H. | - | - | - | Yes | 46 | $117,392 | $0 | $117,392 |
| I.H. | 30 | 24 | - | - | 60 | $153,120 | $76,560 | $76,560 |
| D.C. | | | | | 34 | $86,768 | $0 | $86,768 |
| E.V. | | | | | 46 | $117,392 | $0 | $117,392 |
| **POP Cases** | | | | | | | | |
| P.C. | - | - | 36 | - | 42 | $107,184 | $0 | $107,184 |
| L.D. | 12 | 36 | 0 | - | 52 | $132,704 | $30,624 | $102,080 |
| E.L. | - | - | - | Yes | 42 | $107,184 | $0 | $107,184 |
| I.M. | - | - | 24 | - | 3 | $7,656 | $0 | $7,656 |
| S.P. | - | - | 60 | - | 37 | $94,424 | $0 | $94,424 |
| A.S. | 2* | 36 | - | - | 24 | $61,248 | $5,104 | $56,144 |
| E.W. | - | - | 36 | - | 97 | $247,544 | $0 | $247,544 |
| R.P. | - | - | - | Yes | 97 | $247,544 | $0 | $247,544 |
| W.B. | - | - | 36 | - | 51 | $130,152 | $0 | $130,152 |
| T.C. | 1* | 36 | - | - | 33 | $84,216 | $2,552 | $81,664 |
| M.C. | 5* | 36 | - | - | 33 | $84,216 | $12,760 | $71,456 |
| G.P. | - | - | - | Yes | 41 | $104,632 | $0 | $104,632 |
| P.P. | 1* | 36 | - | - | 52 | $132,704 | $2,552 | $130,152 |
| D.M. | 1* | 24 | - | - | 121 | $308,792 | $2,552 | $306,240 |
| G.J. | - | - | - | Yes | 34 | $86,768 | $0 | $86,768 |
| C.J. | 2* | - | 36 | - | 46 | $117,392 | $5,104 | $140,360 |
| S.D. | - | - | - | Yes | 41 | $104,632 | $0 | $104,632 |
| T.T. | 1* | 12 | - | - | 27 | $68,904 | $2,552 | $66,352 |
| **Total** | | | | | | **$3,382,931** | **$170,984** | **$3,211,947** |

I acknowledge that these programs, here and in the other federal courts listed

below, are too new, too varied, and perhaps still too small to have generated sufficient data for

the sort of reliable evaluation that has been conducted of the state programs. But I and my colleagues here have seen the participants before us work to control their addictions and to overcome the destructive effects of growing up without proper supervision. And instead of "emerg[ing] from prison jobless and facing all the collateral consequences of a felony conviction,"[44] they have become fully-contributing members of their families and productive members of society.

## 2. The Spread of Alternative to Incarceration Programs in the Federal Courts

Key representatives from a total of eleven districts have visited the POP and SOS programs, including judges, pretrial services and probation officers, prosecutors, and defense attorneys.[45] They observed the programs in action, asked us questions about them, and, in many cases, returned to their home districts and created programs inspired by them. Twenty-one of the 96 federal districts now have alternative to incarceration programs, as set forth in Table 3.[46]

---

[44] *Leitch* at *2.

[45] Specifically, on January 22, 2015, the following districts visited: judges, probation officers, and staff members from the Northern District of Florida; judges, probation officers, staff members, and representatives from the U.S. Attorney's Office and the Federal Defender's office from the District of Massachusetts; a judge and probation officer from the District of South Carolina; a probation officer and the United States Attorney from the Eastern District of Louisiana; and judges, pretrial services officers, and others from the District of New Jersey. On June 18, 2015, judges, a probation officer, and the United States Attorney from the Eastern District of Louisiana visited. On September 24, 2015, the following districts visited: judges and pretrial services officers from the Northern District of Illinois; pretrial services officers, the First Assistant United States Attorney, an attorney from the Federal Defender's Office, and others from the Eastern District of California; pretrial services officers from the Middle District of Florida; and probation officers from the Northern District of New York. The pretrial chief and staff from the Eastern District of Pennsylvania and the pretrial chief, staff, and judges from the Southern District of New York have also visited.

[46] As discussed above, this district has two—the POP and SOS programs.

| | Table 3 | |
| | Alternative to Incarceration Programs in the Federal Courts | |
| District | Program | Type |
| --- | --- | --- |
| Arizona | Veterans Program | Veterans Court |
| California Central | Conviction and Sentence Alternatives ("CASA") | Drug Court |
| California Eastern | Better Choices Court | Drug Court |
| California Northern | Conviction Alternatives Program | Drug Court |
| California Southern | Alternative to Prison Sentence Diversion Program | Youth Court |
| Connecticut | Support Court | Drug Court |
| Illinois Central | Pretrial Alternatives to Detention Initiative | Drug Court |
| Massachusetts | Repair Invest Succeed Emerge Program | Drug Court |
| Missouri Eastern | Sentencing Alternatives Improving Lives | High Risk |
| New Hampshire | LASER Court | Drug Court |
| New Jersey | Pretrial Opportunity Program | Drug Court |
| New York Eastern | Pretrial Opportunity Program | Drug Court |
| New York Eastern | Special Options Services | Youth Court |
| New York Southern | Young Adult Opportunity Program | Youth Court |
| Ohio Southern | Special Options Addressing Rehabilitation | Youth Court |
| Oregon | Court Assisted Pretrial Supervision | High Risk |
| South Carolina | BRIDGE Program | Drug Court |
| Texas Western | Adelante Program | Drug Court |
| Virginia Western | Veterans Treatment Court | Veterans |
| Utah | Basin Program | Drug Court |
| Vermont | Rutland Federal Drug Court Program | Drug Court |
| Washington Western | DREAM Program | Drug Court |

These programs are not uniform. For example, the CASA program in the Central District of California, a presentence program with two tracks, is structured differently, and the

participants know at the outset what their sentencing outcome will be if they succeed. The first track, designed for defendants with minimal criminal histories who have been charged with relatively minor crimes, is a diversion program; successful participants get their charges dismissed. The second track is a drug court similar to the POP program, and successful participants receive sentences of probation pursuant to plea agreements under Fed. R. Crim. P. 11(c)(1)(C).[47] Since it began in mid-2012, 108 out of 157 selected participants have successfully graduated from the program; only twelve were unsuccessfully terminated.[48] These results mean that CASA will have saved taxpayers an estimated $9.9 million.[49]

There are other variations on the theme,[50] and more will certainly be created in the years ahead. The alternative to incarceration movement in the federal courts is spreading across the country as more districts learn about and see the enormous benefits these programs produce.

## B. Institutional Support

Apart from the other federal district courts that have created alternative to incarceration programs, many others in the federal criminal justice system have voiced support

---

[47] E.D.N.Y. Report at 35; *see also* Fed. R. Crim. P. 11(c)(1)(C) ("An attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement. The court must not participate in these discussions. If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).").

[48] The Central District of California provided these statistics, and they are on file with the Chief Pretrial Services Officer in this district. Of the successful participants, 82 were on track one, and 26 were on track two. *Id.*

[49] *Id.* This figure was calculated by estimating that each successful participant would have otherwise served, on average, three years of imprisonment.

[50] Descriptions of several of the other programs are set forth in the E.D.N.Y Report. *Id.* at pp. 35-47.

for them and taken action to assist them.

1. *The Department of Justice*

POP and SOS have had the full support of the U.S. Attorneys in this district, including Loretta Lynch, Kelly Currie, and Robert L. Capers.

In September 2014 Deputy Attorney General ("DAG") James Cole visited these programs in our Brooklyn courthouse; in October 2015 DAG Sally Yates did the same; and in October 2014 Attorney General ("AG") Eric Holder attended and spoke at a joint session of both programs in our ceremonial courtroom. All three expressed their support for the programs and enthusiasm for alternative to incarceration programs generally. DAG Cole stated that the POP and SOS sessions were "just what I envision the criminal justice system [is] really supposed to be looking like."[51] Two years before that, in remarks at New York University School of Law, he expressed the need for expanding "drug court, reentry and other related programs . . . not only [to] improve public safety and public health, but [to] protect and leverage taxpayer dollars, safeguard communities in need and assist individuals and families in crisis."[52] And in March 2011, DOJ amended its policies to allow a United States Attorney to divert eligible defendants from "traditional criminal justice processing" upon successful completion of a pretrial diversion program.[53]

---

[51] Tr. of Proc., Sept. 11, 2014, at 45 (on file with the court).

[52] James M. Cole, Deputy Attorney General, U.S. Dep't of Justice, Speech at New York University School of Law on Alternatives to Incarceration: The Use of "Drug Courts" in the Federal and State Systems (May 21, 2012), *available at* http://www.justice.gov/opa/speech/deputy-attorney-general-james-m-cole-speaks-alternatives-incarceration-program-use-drug ("DAG Cole Speech").

[53] *See* U.S. Attorneys' Manual, Title 9, § 9-22.010; *see also id.* § 9-22.100 ("The U.S. Attorney, in his/her discretion, may divert any individual against whom a prosecutable case exists and who is not: 1. Accused of an offense which, under existing Department guidelines, should be diverted to the State for prosecution; 2. A person with two or more prior felony convictions; 3. A public official or former public official accused of an offense arising out of an alleged violation of a public trust; or 4. Accused of an offense related to national security or foreign affairs.").

On the same day she visited the POP and SOS programs, DAG Yates spoke at Columbia Law School, where she stated that "[w]hile it's true that there are dangerous defendants from whom society needs to be protected, there are others, like the defendants I saw today, for whom alternatives to incarceration make a lot more sense."[54]  And when AG Holder visited, he called such programs a "no brainer" because they cut costs, reduce crime rate, and give people a chance to begin a productive life.[55]  The programs in other federal districts have also received visits and support from DOJ officials.  For example, AG Holder took a "Smart on Crime Tour" in 2013, visiting a number of these programs, including the District of South Carolina's BRIDGE Program.[56]

2. *The Judiciary*

In response to a 2014 survey conducted by the Sentencing Commission, more than half (59%) of district judges favored a revision in the Guidelines Manual to provide "more options for judges to address offenders' violations of the conditions of their supervision (*e.g.*, more alternatives to incarceration)."[57]  In a 2010 Commission survey, as I described in *Leitch*, "over half of district judges . . . favored greater sentencing alternatives in drug trafficking cases."[58]  These recent surveys are consistent with the views held by the majority of district judges for the past 20 years:

---

[54]     Sally Quillian Yates, Deputy Attorney General, U.S. Dep't of Justice, Speech at Columbia Law School on Criminal Justice Reform (Oct. 29, 2015), *available at* https://www.justice.gov/opa/speech/deputy-attorney-general-sally-quillian-yates-delivers-remarks-criminal-justice-reform.

[55]     Tr. of Proc., Oct. 30, 2014, at 39 (on file with the court).

[56]     *See* The Attorney General's Smart on Crime Initiative, Office of the Attorney General, *available at* http://www.justice.gov/ag/attorney-generals-smart-crime-initiative (updated Dec. 1, 2015).

[57]     U.S. Sentencing Comm'n, Results of 2014 Survey of United States District Judges: Modification and Revocation of Probation and Supervised Release tbl. 5 (February 2015)

[58]     *Leitch* at *13 (citing U.S. Sentencing Comm'n, Results of Survey of United States District Judges January 2010 through March 2010 tbl. 11 (2010)).

In response to a 1996 survey by the Federal Judicial Center, which asked whether the Guidelines appropriately identify offenders who should be eligible for alternatives to incarceration, nearly two-thirds of federal district judges and chief probation officers stated that more offenders should be eligible for such programs. Nearly two-thirds of district judges and over half of chief probation officers responded that alternatives to incarceration should be made available to first-time offenders generally and to offenders with extenuating circumstances, such as illness, disability, or dependents. And nearly half of district judges and over half of chief probation officers responded that alternatives to incarceration should be made available to nonviolent offenders generally.[59]

The Federal Judicial Center ("FJC") has organized several events dedicated at least in part to promoting pretrial alternatives to incarceration. On June 16–17, 2014, it hosted a Smart on Crime Implementation Workshop, where district judges were invited to learn about such programs. In July 2015, the FJC held a National Workshop for Magistrate Judges, and it invited the judges from our POP and SOS programs to speak. Similarly, its National Workshop for District Judges, scheduled for next month in Charleston, South Carolina, will have a session devoted to the efficacy and cost-effectiveness of drug courts, including presentence programs like POP. Finally, the FJC has organized a federal track at the National Association of Drug Court Professionals' annual conference on June 1–4, 2016, where it plans to organize events about federal problem-solving courts.

3.  *The American Bar Association*

The ABA has also voiced support for alternatives to incarceration. In 2003, it established the Justice Kennedy Commission to investigate and issue recommendations to address mass incarceration. One recommendation was to "[s]tudy and fund treatment alternatives to incarceration for offenders who may benefit from treatment for substance abuse

---

[59]     *Leitch* at *13 (citing Molly Treadway Johnson & Scott A. Gilbert, Federal Judicial Center, The U.S. Sentencing Guidelines: Results of the Federal Judicial Center's 1996 Survey 15 (1997)).

and mental illness" and to "[a]dopt diversion or deferred adjudication programs that, in appropriate cases, provide an offender with an opportunity to avoid a criminal conviction."[60]  In 2007, in another set of policy recommendations, the ABA again voiced its support for alternatives to incarceration, including deferred adjudication and sentencing and diversion options.[61]  The ABA has also encouraged the Commission to make use of alternative to incarceration programs in the federal system.[62]

*C.  The Sentencing Commission's Failure to Support Alternative to Incarceration Programs*

In July 2008, the Commission hosted a Symposium on Alternatives to Incarceration ("Symposium").  "[J]udges, congressional staff, academics, prosecutors, defense attorneys, and corrections and alternative sentencing practitioners" met for two days to discuss the use of "alternatives to incarceration in the sentencing process."[63]  The Symposium included sessions on "Drug Courts/Treatment Options," "Practical Approaches to Supervision (Non-Incarceration Alternatives)," and "Alternatives in the Guidelines."[64]

---

[60]        ABA Justice Kennedy Commission, Reports with Recommendations to the ABA House of Delegates 10 (2004).

[61]        ABA Commission on Effective Criminal Sanctions, Second Chances in the Criminal Justice System: Alternatives to Incarceration and Reentry Strategies 10 (2007).

[62]        *See, e.g.*, James E. Felman, Co-Chair, Criminal Justice Section Committee on Sentencing, American Bar Association, Testimony Before the United States Sentencing Commission, at 9 (Mar. 17, 2010) ("[T]he ABA has long supported the use of alternative sentences for offenders whose crimes are associated with substance abuse or mental illness and who pose no substantial threat to the community . . . .  We encourage the Commission to make the greatest use of such treatment possible because we believe this will maximize the opportunities for better outcomes, reduced recidivism, and the avoidance of unnecessary incarceration.").

[63]        *See* Welcome and Introductions, the Hon. Ricardo H. Hinojosa, Chair, U.S. Sentencing Comm'n, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20080714-alternatives/01_FINAL_Welcome&Intros.pdf ("Welcoming Remarks").

[64]        *See* Proceedings from the Symposium on Alternatives to Incarceration, U.S. Sentencing Comm'n, Symposium on Alternatives to Incarceration (July 14–15, 2008), *available at* http://www.ussc.gov/research-and-publications/research-projects-and-surveys/alternatives/proceedings-symposium-alternatives-incarceration-july-14-15-2008.

The upshot of the Symposium came in 2009, when the Commission adopted an amendment applicable to a tiny subset of low-level offenders—those in Zone C, whose Guidelines range is either 10–16 or 12–18 months.[65]  Typically, for Zone C defendants, the Guidelines allow sentencing judges to replace half of the minimum end of the range with an alternative such as intermittent confinement, community confinement, or home detention.  The 2009 amendment authorized sentencing judges to depart for such defendants to allow all (or most) of the minimum end of the sentencing range to be satisfied by those alternatives where it is "appropriate to accomplish a specific treatment purpose,"[66] but only if the judge finds that "(A) the defendant is an abuser of narcotics, other controlled substances, or alcohol, or suffers from a significant mental illness, and (B) the defendant's criminality is related to the treatment problem to be addressed."[67]

It's impossible to overstate how insignificant this amendment was.  First, fewer than 9% of offenders are even eligible to be considered for this departure, and in this district it's fewer than 7%.[68]  As I said in *Leitch*, "[i]n my 18-plus years on the bench I may have had a drug trafficking defendant with a Guidelines range that low, but I cannot remember one."[69]  Second,

---

[65]  The Guidelines split up the Sentencing Table into zones—A, B, C, and D.  The Guidelines provide that a judge may sentence a person to probation if her guidelines range is in Zones A or B of the Sentencing Table; that is, if her offense level is no higher than 11.  *See* U.S.S.G. § 5B1.1(a).  A person in Zone C—that is, a person with an offense level no higher than 13, and subject to a range the upper end of which is no higher than 18 months— is eligible under the Guidelines to have her range satisfied by a partial (at least half) term of incarceration combined with a term of supervised release and either community confinement or home detention.  *Id.* § 5C1.1(d).  A person in Zone D must, according to the Guidelines, receive a sentence of imprisonment.  *Id.* § 5C1.1(f).

[66]  U.S.S.G. § 5C1.1 cmt. n. 6.

[67]  *Id.* app. C, Vol. III, amend. 738 (2012); *id.* § 5C1.1 cmt. n. 6.

[68]  *See* Table 23, *U.S.S.G. Interactive Sourcebook, available at* http://isb.ussc.gov/USSC?userid= USSC_Guest&password=USSC_Guest&toc-section=0.

[69]  *Leitch* at *13.

the amendment addresses only *post-sentence* drug treatment. The Guidelines continue to say nothing about a defendant's involvement in judge-involved *presentence* drug or other problem-solving courts.

Moreover, the Guidelines explicitly discourage judges from departing downward based on a defendant's drug or alcohol dependence when determining that individual's Guidelines range.[70] Thus, the 2009 amendment emphatically has not done enough for individuals incarcerated in federal prisons. This failure is particularly acute given that numerous studies conducted over decades have consistently found that the majority of incarcerated persons have substance abuse problems.[71]

As of December 26, 2015, 86,080 people are in federal prison for drug offenses.[72] That's 46.5% of the entire prison population.[73] It's 54,788 more people than the second highest offense category by population—for weapons, explosives, and arson (16.9% of all inmates).[74]

---

[70] U.S.S.G. § 5H1.4 ("Drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure. Substance abuse is highly correlated to an increased propensity to commit crime.").

[71] *See* U.S. Dep't of Justice, Bureau of Justice Statistics, *Drug Use and Dependence, State and Federal Prisoners*, tbl. 2 (Oct. 2006), *available at* http://www.bjs.gov/content/pub/pdf/dudsfp04.pdf (in 2004, 64% of all federal prisoners reported using drugs regularly); Kamala Mallik-Kane & Christy A. Vishner, Urban Inst., Health and Prisoner Reentry: How Physical, Mental, and Substance Abuse Conditions Shape the Process of Reintegration, at 11 (2008), *available at* http://www.urban.org/sites/default/files/alfresco/publication-pdfs/411617-Health-and-Prisoner-Reentry.PDF (finding that seven out of ten men and women participating in a reentry study had a substance abuse problem); *New CASA Report Finds: 65% of all U.S. Inmates Meet Medical Criteria for Substance Abuse Addiction, Only 11% Receive Any Treatment*, Nat'l Ctr. on Addiction & Substance Abuse at Columbia Univ. (Feb. 26, 2010), *available at* http://www.centeronaddiction.org/newsroom/press-releases/2010-behind-bars-II (finding that 65% of U.S. inmates met the medical criterial for substance abuse addiction); *The Facts on Drugs and Crime in America*, Nat'l Association of Drug Court Professionals, *available at* http://www.nadcp.org/sites/default/files/nadcp/Facts%20on%20Drug%20Courts%20.pdf ("80 percent of offenders abuse drugs or alcohol" and "[n]early 50 percent of jail and prison inmates are clinically addicted") (citations omitted).

[72] *See Inmate Statistics, Offenses*, Fed. Bureau of Prisons (Dec. 26, 2015), *available at* https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp.

[73] *Id.*

[74] *Id.*

These drug offenders are mostly non-violent. They generally are not major players in a drug organization. In 2014, only 7.1% of drug offenders received an aggravating role adjustment for acting as a manager or leader, "*i.e.* individuals occupying the highest rungs of a drug enterprise."[75] Almost half (48.6%) of drug offenders are in criminal history category I, signifying a minor or no criminal history.[76] And roughly 84% of drug offenders had no weapon involved in their offense.[77]

We cannot afford to unnecessarily house all these people in federal incarceration facilities. The requested BOP budget for FY 2016 was $7.34 million—that's 25% of DOJ's entire budget.[78] In contrast, the number of individuals given probationary sentences is still dramatically low compared to historical levels. Probation is too often overlooked; it is "a sentence in and of itself . . . [and] may be used as an alternative to incarceration."[79] Pre-Guidelines, nearly 50% of federal defendants received a sentence of probation.[80] Congress mandated that the Commission "insure that the guidelines reflect the general appropriateness of

---

[75]     *Leitch* at *10; 2014 Sourcebook at tbl. 40.

[76]     *Id.* at tbl. 37.

[77]     *Id.* at tbl. 39.

[78]     *See FY 2016 Budget Summary*, U.S. Dep't of Justice, *available at* http://www.justice.gov/sites/default/files/jmd/pages/attachments/2015/02/02/2016_budget_summary_pages_5-12.pdf (DOJ's requested Fiscal Year 2016 budget was $28,653,702); *Federal Prison System (BOP)*, U.S. Dep't of Justice, *available at* http://www.justice.gov/sites/default/files/jmd/pages/attachments/2015/01/30/30_bs_section_ii_chapter_-_bop.pdf (requested Fiscal Year 2016 budget for the BOP was $7,344,700).

[79]     U.S.S.G. § 5B1.1, Intro. Comm. (citing 18 U.S.C. § 3561). Probation metes out significant punishment; "[o]ffenders on probation are . . . subject to several standard conditions that substantially restrict their liberty," including travel and employment restrictions, regular reporting, permitting unannounced visits to their home, restrictions on associating with certain individuals, and, in many cases, substance abuse monitoring. *Gall v. United States*, 552 U.S. 38, 48–49 (2007).

[80]     Kate Stith & Jose A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 62 (1998) ("While before the Guidelines nearly 50 percent of federal defendants were sentenced to probation alone, that figure is now less than 15 percent.").

imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."[81]  But instead, the Commission "unilaterally declared in 1987 that every theft, tax evasion, antitrust, insider trading, fraud, and embezzlement case is 'otherwise serious,' and thus no more eligible for a sentence of probation, even when committed by a firsttime offender, than would a crime of violence."[82]  Given the Commission's gross departure from Congress's directive encouraging probation, it is no surprise that the percentage of federal defendants who received probation in 2014 had dropped to 7.2%.[83]

## D.  Recommendations to the Commission

Almost two years ago I asked the Commission to authorize a downward departure for successful participation in a judge-involved intensive supervision program.[84]  Specifically, I asked it to "(1) amend the Guidelines to encourage [alternatives to incarceration programs]; (2) take steps to inform the federal courts around the country about them; and (3) assist in gathering data about them with an eye toward evaluating and improving them."[85]  I now reiterate these requests.  The alternatives to incarceration movement deserves the Commission's support and

---

[81]      28 U.S.C. § 994(j).

[82]      *Leitch* at *1 (quoting U.S.S.G. Ch. 1, Pt. A, § 1.4(d) (1987) ("Under present sentencing practice, courts sentence to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are 'serious.'  If the guidelines were to permit courts to impose probation instead of prison in many or all such cases, the present sentences would continue to be ineffective.  The Commission's solution to this problem has been to write guidelines that classify as 'serious' (and therefore subject to mandatory prison sentences) many offenses for which probation is now frequently given.")).

[83]      2014 Sourcebook, at Fig. D.

[84]      *See* Letter from the Hon. John Gleeson, U.S. District Judge in the Eastern District of New York, to Patti B. Saris, Chief Judge & Chair, United States Sentencing Commission (May 21, 2014) ("2014 Letter") (on file with the court).

[85]      *Id.* at 2.

encouragement, and the Commission needs to step up and perform the role it was created to perform.

First, the Commission should amend the Guidelines to include a statement that the sentencing judge should consider a downward departure for successful participation in a judge-involved intensive supervision program. The amendment I propose need not be and should not be any more complicated than that simple statement. These programs come in different shapes and sizes, and thus would evade any attempt to craft a more specific departure provision. But their proven success so far—along with the ample social science proving the success of equivalent programs in state courts[86]—justifies a departure ground that would encourage successful completion of these programs. As the programs evolve and mature, and data is gathered and evaluated, more specific guidance may become appropriate. But right now the judges, pretrial services and probation officers, prosecutors, and defenders involved in these programs—and of course the participants as well—need the support a simple departure authority would confer.

I understand that my request requires the Commission to "trust[] district courts to act responsibly in creating the programs and sentencing judges to act reasonably in sentencing the participants,"[87] but it's about time our sentencing policy began trusting the judges again. We are almost 30 years into a regime that was founded on the idea that we couldn't do that anymore, and the one thing everyone seems to agree on now is that regime hasn't worked out well and needs to be fixed. Finally, as is true with respect to all sentencing outcomes, the government can

---

[86] *See supra* pp. 11–12; *see also* DAG Cole Speech, *supra* n. 52 ("Rigorous studies have shown how [state] drug courts work and have validated that they reduce both recidivism rates and public safety costs. In fact, they've been found to reduce crime more than any other sentencing option.").

[87] 2014 Letter at 2.

always seek appellate review to correct any unreasonable departures on the ground I propose.

Second, the Commission should inform federal judges about these programs. It can do so easily by creating a page on its website that would be the centralized information hub devoted to alternative to incarceration programs in the federal system. As I stated in my 2014 Letter, "I have received dozens of inquiries from [interested] persons about our programs . . . . The Commission's website is a logical repository for such information."[88] The page I ask the Commission to create would not just list the various programs around the country, it would include all of their formative documents and any data they have gathered. There are now too many of these programs, and too much hard work by the various people who have created them, for the Commission to continue to act like they don't exist.

Third, the Commission should help us gather and disseminate data, and determine best practices. The only way to subject these federal alternative to incarceration programs to the scrutiny they deserve—and have received in the states—is to collect and analyze data about them not on a court-by-court basis, but on a national level. The Commission is uniquely positioned to do that and to help us answer a number of outstanding questions, including:

> What types of alternatives to incarceration programs should federal courts have? What defendants should be eligible for such programs? What are the best practices with respect to support services, intensity of supervision, dealing with violations, and conducting the monthly meetings? Will the federal defendants who successfully complete these programs have lower recidivism rates over time? Do the ways the participating judges interact with the participants affect the efficacy of the programs? Can judges be trained to be more effective?[89]

In sum, the failure of the Commission to even acknowledge, let alone support,

---

[88] *Id.*

[89] E.D.N.Y. Report at 56.

federal alternative to incarceration programs no doubt leads some judges to conclude they should not create such programs, or reward successful participation in them. This is wrong. It's not just bad policy, it also threatens to make the Guidelines Manual as a whole increasingly anachronistic. Dokmeci's case places my point in the starkest possible relief: in a case where the defendant has reformed herself so fundamentally and so impressively that the prosecutor has decided she should even have a *conviction*, the Guidelines Manual still says she can't even get a *departure*.

E. *The Defendants and their Successful Participation in the POP Program*

Lastly, but most importantly, the Commission should make these changes because they will have concrete effects on real, three-dimensional people. These people have families and they come from communities, the communities we are sworn to serve. I write today about two of the people who have benefitted from the POP program: Sinem Dokmeci and Chloe Jakab.

1. *Sinem Dokmeci*

Dokmeci was arrested on July 2, 2013. She was 33 years old, 34 weeks pregnant, and addicted to heroin. When she was arrested, she was seven years into her opiates addiction, and she was injecting five bags of heroin and taking ten oxycodone pills daily. Shortly after her arrest, she gave birth to a daughter, who was addicted to opiates and removed from her mother's custody. Dokmeci was also the mother of a seven-year-old.

Dokmeci grew up in Brooklyn in a two-parent, financially secure home. She graduated from high school and had a partial scholarship for college. But she ended up dropping out of school, working various jobs until she got married, at age 23, to her boyfriend of seven years. When she was 25, she gave birth to her first daughter via a C-section. Her doctor prescribed her Percocet. Her husband, a recreational drug user, supplemented the prescribed

Percocet with more that he bought on the street. Dokmeci gradually began using more Percocet each day, eventually switching to oxycodone, and then—at 31 years old—she began abusing heroin. The New Jersey Division of Youth and Family Services removed Dokmeci's older daughter from her custody because of this drug use.

After her arrest and six weeks in custody, Dokmeci entered a residential drug treatment program. That was the beginning of her recovery, but like a lot of people in her circumstances, her recovery had its ups and downs. Dokmeci was discharged three months into her stay for using heroin and engaging in an inappropriate relationship at the facility. After she entered a different residential program, things started looking up. She spent weekends with her newborn at the facility. And on January 30, 2014, she was received into the POP program.

Eight months later, her residential treatment program released her. Today, Dokmeci has been sober for more than 28 months. She has also weaned herself off of methadone. She lives with her current boyfriend, has a new job, and has regained custodial rights over both daughters. And in December 2015, the United States Attorney's Office announced that the felony drug trafficking charges they brought against Dokmeci back in July 2013 would be dropped after a term of supervision pursuant to a DPA.

If all I had to go on in approving Dokmeci's DPA was the Guidelines Manual, I would have to conclude that I could not consider Dokmeci's participation in the POP program when determining a just and fair sentence. Given the demonstrated success of these programs, not only in the states but also now in the federal system, there is no excuse for the Commission to foster that impression. The fact that the Guidelines are no longer mandatory is no reason for them not to "reflect, to the extent practicable, advancement in knowledge of human behavior as

it relates to the criminal justice process."[90]  As mentioned above, the Commission needs to address the anomaly that the government has sought the outright dismissal of charges in circumstances in which the Guidelines do not even authorize a downward departure.

2. *Chloe Jakab*

Jakab was arrested in September 2013.  She was 27 years old.  Two months after her arrest, she pleaded guilty to conspiring to distribute oxycodone.

Jakab also grew up in a middle-class, supportive home.  When she was 17, she started using prescription pain medication, which in turn led to an addiction to heroin.  At her worst, Jakab shot up 20 bags of heroin per day.  She had received drug treatment in the past— three detoxification programs and a short-term residential treatment program—but nothing had worked.

After nearly three months in prison, Jakab entered a residential drug treatment program, and in December 2013 she joined POP.  Just a month later, she relapsed, and she tested positive for heroin.  She stayed both in her residential program and in POP, but was disengaged in her treatment.  Eight months later, she violated the rules of her residential treatment program and was discharged.  Still, Jakab remained in POP, and after she started residential treatment at another facility, her attitude changed.  In January 2015, she got a full-time job as an office manager.  In March 2015, she completed residential treatment.  She has now been clean for more than 25 months.  In June 2015, she graduated from POP in a ceremony attended by both her parents.  Because of the accomplishments she achieved in POP, I sentenced Jakab in September 2015 to time served (nearly three months of incarceration) and 36 months of supervision.[91]  She

---

[90]        28 U.S.C. § 991(b).

[91]        Minute Entry (Sept. 4, 2015).

remains in the post-sentence component of the POP program. She is doing well at work and has become a role model and important source of support for the other participants in the program.

As discussed above, the Guidelines Manual did not authorize the time-served sentence I imposed on Jakab, a sentence the government agreed was the only just one given the circumstances. The absence of such a departure authority represents a fundamental policy defect in the Guidelines, a defect that can easily be remedied by adopting the recommendations I respectfully set forth above.

## CONCLUSION

For the reasons explained in this opinion, I accepted Dokmeci's deferred prosecution agreement, and I sentenced Jakab to a sentence that did not require further incarceration. I know I speak for all the judges directly involved in POP and SOS in saying that these programs are indisputably the right thing to do. They help the defendants and their families without endangering the community or undermining the purposes of punishment. I urge the Commission to support these programs by authorizing the downward departure requested above, by helping to gather and evaluate data about them, and by disseminating information about them to others in the criminal justice system.

So ordered.

John Gleeson, U.S.D.J.

Dated: March 9, 2016
        Brooklyn, New York